Good morning, Your Honors. Good morning. I'm very pleased to be here today, and I thank you for your time and attention. May it please the Court, my name is Justin Harrell, and I represent the appellant, Mr. Francis Reed. Mr. Reed was charged, tried, and convicted for the aggravated rape of his two minor stepchildren. In a case that involved no physical evidence, no DNA, and no corroborating witnesses, trial in this matter was what the State of Louisiana termed to be a classic credibility contest. It pitted the credibility of Mr. Reed, who testified on his own behalf, against that of his two teenage accusers. The defense theory at trial was that Mr. Reed was a strict disciplinarian, and that these two minor children contrived and conspired to contrive allegations of sexual abuse in retaliation for or in response to Mr. Reed's strict discipline. Into this volatile mix of facts at trial fell criminal defense gold, manna from heaven, Your Honors, in the form of an April 2006 interview between the oldest of the two teenage accusers, who was 14 at the time, and Ms. Bethany Case, an interviewer with the Children's Advocacy Center in Slidell. During that interview, the older accuser confessed to Ms. Case that the last incident of alleged abuse had been fabricated. She indicated that when she had spoken to law enforcement, she was, quote, veering around the truth, that, quote, nothing happened, and, quote, she was seriously just upset about being sent to her room. Three years later, now age 17, the accuser took the stand in Mr. Reed's 2009 trial. At that time, she reversed herself, or rather, to be fair, she reversed her reversal. She recanted her recantation. Now she told the jury that that last incident of abuse, which I should hasten to add is an important incident, because that's the one that allegedly leads to the disclosure of the abuse, the investigation, the arrest, indictment, trial, and conviction of Mr. Reed. At trial, the accuser reverses herself and now says that event did occur. Under Louisiana law, defense counsel had access to that 2006 CAC interview, but he chose to do nothing. He did not impeach the accuser. He did not correct her perjury. Her statements that counsel knew or should have known were false. He allowed her to simply sit up there and invent an entirely new allegation of abuse pertaining to his client while counsel did nothing. Did that tape also include other incidences? Did she testify about other incidents? She did testify about other incidents, and the tape did include the entire range of things that she said occurred. And the state's main contention in response to this action has always been that, well, defense counsel simply didn't want the CAC tape to come in. No defense counsel wants the CAC tapes to come in. Obviously, under Louisiana law, the CAC tape, if it is properly recorded and certain parameters are followed, is admitted into evidence, but it is not typically published to the jury if the defense and the state can agree by stipulation to the consistency of the evidence, which is what occurred in this case. Now, I submit, Your Honor, as a close reading of the record, highly suggest that Mr. Edward Laverdine, the trial attorney in this case, stipulated prior to the accuser's testifying at trial, but be that as it may, he did concede to the consistency of the case. The problem with the state's rationale is that the Constitution doesn't accept a one-size-fits-all defense. We don't have pro forma defenses where you simply scratch out the last defendant's name and add the new defendant's name. Every defense attorney is charged by the U.S. Constitution to make an independent assessment of the facts and law of his or her particular case before they decide to engage in a strategy. So if Mr. Laverdine showed up on the day of trial already convinced that he was not going to, under any circumstances, allow the CAC tapes to come in, then he failed Mr. Reed because the situation is these tapes contained not just an inconsequential contradiction, not just a conflict as to a date or a time or the exact parameters or description of an event. These tapes included a tactile, significant, substantive confession that dovetailed hand and glove into exactly what the defense theory had been. To not introduce it out of fear of the other allegations that might be included in there and to allow the accuser apparently to have free reign to say whatever she wanted because counsel was under no circumstances going to impeach or going to allow that CAC tape to get in was simply unreasonable. Had the tape come in, it would have demonstrated to the jury felonious perjury. This young woman took the stand, put her hand on a Bible, swore to tell the truth and then invented an act of abuse that she had confided in private during the CAC interview never happened. So whatever counsel's concerns about other allegations, I don't believe any attorney, any attorney could have sat on such a bombshell and allowed an accuser and an alleged victim to testify as to an event, an incident of abuse that counsel knew did not occur. Under the Louisiana rules of evidence, would that have opened the door for the prosecution now to come and play the tape of this 14-year-old girl going into details about the assaults that were taking place? So you would show that in one incident she lied, but it would also show other incidences of assaults taking place. So isn't it sort of a double-edged sword that, yes, you might show her lying in one incident, but it repeats what she said in person now when she's a 14-year-old three years earlier, repeating the assault. So it can help, but can it also hurt? I believe under these circumstances its advantage to the defense was so incredible and its damage to the reputation of this witness so complete that in this situation, using and analyzing the facts and law of this case, it would have only benefited the defense. Yes, Your Honor, I do believe having impeached this young woman with her own admission to fabricating abuse, having now revealed her perjury at trial, the state of Louisiana could in theory have chosen to replay the tape in its entirety. But now the proverbial shoe is on the other foot. Typically, defense attorneys have to engage in that debate as to whether or not there is enough benefit from certain conflicts or contradictions or nuances in the CAC tape to risk running the gauntlet and having all the evidence come in. This time it would be the state making that decision. Once counsel impeached this young woman, once counsel revealed that she had committed a felonious act of perjury punishable under Louisiana law by five to 40 years, once counsel had done that, the state would now have to grapple with that debate. Do they admit the entire CAC tape so that once again the jury can see a 14-year-old girl confess that she made up an allegation of sexual abuse because she was seriously just upset to being sent to her room? Or would the state now take what they got, circle the wagons, and not admit the tape? I don't believe this is a type of situation where there was a significant risk to the defense to simply have this confession of perjury, this confession of fabrication, played for the jury twice. I think in this case it was the only thing to do. This was a pearl, and defense counsel simply didn't grasp it, and he didn't grasp it to the detriment of Mr. Reed. We frequently get scenarios where later counsel, such as yourself, in these cases, I hesitate to use the term 20-20 hindsight because I don't mean that in any ill way, but in the heat of battle, in a trial, it's an understatement to say that this kind of a case with children being abused, et cetera, is delicate, difficult, and whatever other words one might put to it. So counsel on the ground makes what would be labeled a tactical decision, weighing these options, and makes a decision and moves forward. Then later, erstwhile counsel makes passionate, pro-view arguments that the tactical decision made on the ground was erroneous and erroneous to a palpable degree. To wit, you're saying things like perjury and so on and so forth, and those aren't normally associated with a child witness. I mean, that's pretty strong. So at any event, within my question is that when I read this, I read it the question that the magistrate judge considered when reviewing this, the trial judge, et cetera, was that there was a proverbial tactical strategic decision made by counsel on the ground not to reopen this so the state wouldn't play the full tape and the jury hears all this and on and on and on. But I hear you saying that this was not a tactical decision. You're saying this was not a close issue is what I guess you're saying. I'm saying, Your Honor, I believe this was a knee-jerk form of strategy. Well, I read it that they were inconsistent. You're saying almost a wholesale recantation. Of course, we've got some excerpts of the transcript, and we'll end up looking at it all. But I guess embedded with my question, what difference, if any, is there to the sort of tactical strategic decision made, even though in the light of today, one might say, Well, I would have done something different. I mean, does that auger up at all, or is it, as you say, such a case that, you know, right is right, wrong is wrong, so to speak? You follow me? If I'm following Your Honor's question, my feeling is this. This court has recognized the distinction between strategic judgment calls that counsel has to make, as you say, on the ground in the moment, and plain omissions and errors that have no basis in the record, no strategy, nothing that this court can glean from reviewing the materials before it to say counsel made an educated decision based on all the facts and law in front of him or in front of her. This is the latter case. There is a knee-jerk reaction where we go, Oh, CAC interview, you know, a younger witness, and she's going to be or he's going to be recounting events and how harrowing that is, and jurors don't want to see it. Well, your typical case doesn't involve a child who is, A, confessed to making up an incident of abuse, and, B, has now got to be caught having changed her story again on the stand. This child took the stand at 17 and said, Yes, I was abused that day. At 14, she said, No, I was veering around the truth. I was seriously just upset when I went to bed or when I got sent to my room. This is not the case where there is anything on the record. The record is silent, and strategic decisions cannot be condoned by this court based on a silent record that does not bear out counsel's position. Counsel was inexperienced with these types of cases. He came in following a series of nuts and bolts. He cracked the spine of that criminal defense 101 handbook the morning of trial, saw that CAC interviews aren't generally favored, and said, That's the policy I'm going to follow. That's the strategy. And even if counsel terms its strategy, that's not sufficient. Counsel has an independent constitutional duty to review the facts, to review the tape, to review the tape and go, Wow, look, that's significant. And then when a witness deviates from that to such a degree as to border on perjury, counsel has an obligation to respond. Does your review of the record indicate that defense counsel did or did not know the full contents of the tape? It is speculation on my part, Your Honor, but I believe that the record bears out strong indicia that counsel never looked at the CAC tape. I'm sorry? That counsel never reviewed the Children's Advocacy Center tape of the interviews. I believe that's borne out by the fact that counsel is willing to stipulate as he makes several comments, albeit they're in dicta, but there are several comments in the transcripts that seem to suggest he doesn't even need to hear what these young women have to say. He's already agreed that it's consistent, and that to me suggests highly that he had not reviewed it and had not done his due diligence. Stewart made reference to 2020 hindsight. I think in this case it's 2254 hindsight, but be that as it may. Did the State Habeas Corpus Court consider the second prong of the Strickland case? That is a reasonable probability that this would have — that the verdict would have been otherwise. I mean, was that addressed on the State court level? My recollection, Your Honor, is that it was not addressed. That's my recollection, and I could stand to be corrected. But I believe that the trial court, which is the last reason decision in this matter at the state level, simply indicated that, again, pro forma, CAC interviews, not usually in. You know, defense counsel doesn't usually want them. Therefore, defense counsel was acting in a strategic manner, and I don't think they ever got to an additional prong. But, Your Honors, I'm going to ask, as I see that I'm running out of time, I'm going to ask that Your Honors order the remand and release of Mr. Reed and order a reversal of his trial, or in the alternative, I ask that you remand this matter back to the U.S. District Court for further proceedings consistent with Your Honor's instructions. Where is he now? He's located in the Department of Corrections, Angola, Louisiana State Penitentiary. All right. Thank you. You've reserved your rebuttal time. Yes, I have, Your Honor. Thank you so much. Thank you. Mr. Kaplan. Good morning. May it please the Court. My name is Matthew Kaplan. I'm the assistant district attorney for Louisiana's 22nd Judicial District. I represent Darryl Vannoy, the warden of Louisiana State Penitentiary, which is the facility at which Mr. Reed is housed. So I'll start with the standard of review. Under 2254, the petitioner has the burden of showing an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. The clearly established law comes from Strickland v. Washington, which has the familiar performance prejudice prongs. And so the allegation is that counsel was deficient. The deficient performance was inadequate cross-examination of a minor victim of sexual abuse. And my reading of the record indicates that neither the state district court nor the federal district court addressed the prejudice prong, so that if Mr. Reed is entitled to relief, it would be a remand to the district court to consider the prejudice prong, which would probably be de novo because if there isn't a reason, state court decision below. Now, at this point, I'd like to direct the court's attention to the state court record, particularly volume 4, page 898, lines 11 to 17. It's part of trial counsel's closing argument, where he says, I've been practicing for 45 years. When you start crying on the stand, you leave them alone. I had a whole lot of other questions I had, but you leave them alone because people just don't like that. So cross-examination of minor victims of sex offenses is particularly delicate, and the record, at least in the form of trial counsel's closing argument, suggests that he was experienced, he knew what he was doing, and he curtailed his cross-examination for strategic reasons. Now, as far as the argument that the decision was made in it. Back up to what you just said. How do we get that out of that quote? That, I'm sorry? How do we get the conclusion you just stated from the quote you read? That he said, I have a whole lot of other questions, but basically people don't like it. I would alienate the jury if I beat up on these girls. Well, I mean, I kind of hear it, but I feel like you're extrapolating a lot out of that quote in terms of, you know, I mean, one could read it. It's painful. It's difficult. I know you're saying he was crying when he made it. So, but at least the idea that this guy picked up a nutshell book and walked in, didn't know what he was doing, he is at least a guy who's been practicing for 45 years. Now, as far as whether or not he. I mean, that wouldn't mean that he's handled, you know, these kind of cases before. Anyway, I'm not bickering with you. It's just you read the quote, and I was expecting you to say more out of the quote than you did, and then you went from reading it to say, well, it means he made a strategic decision, you know, not to ask these questions, body, body. But anyway, I understand. Okay, so you're not intimidated by that argument. No, I'm just trying to put it in the context of your full argument. I understand now why you read it and for the purpose that you read it. So, no, press on. And so as far as whether the attorney viewed the CAC tape, the defendant testified at trial, and the record reflects that the defendant himself was familiar with the CAC tape. And under Louisiana law. Let's back up. Let's go to the heart of the first matter. Okay. You know, in the briefing, the argument from your side is, you know, at best there are, quote, inconsistencies between the various statements, as there frequently are in depositions and anytime somebody gives a statement multiple times, put aside these are children. But the argument in the briefs is that, yes, there were inconsistencies. Was it Tuesday when it happened or Wednesday? Da-da-da-da. But not of the manifest that counsel opposite argues. No, it wasn't just inconsistencies so that trial counsel didn't want to run the risk of children. He's using the words there was, you know, palpable perjury. In other words, a wholesale recantation of a statement, which is a long way between just inconsistencies. And so my question put to you is, when we read the full thrust of it all, will we find the large scale, not just inconsistency, but difference in the testimony such that it can't be justified as merely a trial strategy? You will not find that. A recantation of a recantation is not perjury. Okay. And, you know, she would have had an opportunity to explain, but she didn't because she wasn't asked. I mean, the question, I guess, is would the jury ultimately have been persuaded to acquit based on her explanation? But so I know that the actual tapes were not produced as part of the state court record. That's noted in the magistrate's report and recommendation. The electronic record on appeal, page one, I'm sorry, page, I've got too many notes here. There's a footnote in the report and recommendation which notes that the videotape was not produced, that partial transcripts were produced by the petitioner and that their accuracy was not disputed by the respondent. And so we've got limited excerpts of. Do they still exist? Yes, sir. The tapes? Yes, sir. All right. Given the magnitude of the allegation and that the tapes exist and that the state court and nobody else looked at them, what would be the state's objection to it going back down for somebody to look at it and make a firm determination based on reviewing it all rather than mere argument about what was and what wasn't? That sounds like a perfectly reasonable course of action. Okay. All right. I'll continue. Candor to the court is always appreciated. Yeah, they're in the evidence vault. It would just be a matter of filing a motion with the district court, authorizing transfer. It's a reasonable course of action, but is it mandated? I don't know that it is. Okay. I mean, counsel has got to have the right to make optional determinations, doesn't he? Well, of course. And in the limited transcript that's been produced, the electronic record on appeal, page 125, and this is going to be kind of graphic for the audience so you might want to close your ears, you would have a video of an 11-year-old girl talking about something of a, quote, whitish creamy color. It went into my mouth and I spit it out. It's, like, nasty. It made me gag. And then she spit it out onto the floor. And then the argument that there was no physical evidence is not exactly correct. There was seminal fluid located in the girl's bedrooms that for which the Petitioner could not be excluded. And the defendant has actually cross-examined about that on, I believe it's volume four of the State court record, page 836, where he says that one of the samples is his, he denies that the other is his, and he doesn't know how they got there. So is this with regard to the second prong, that the likelihood that it might have made a difference and overturned the conviction? Are you saying that there was sufficient evidence there to convict with or without the cross-examination or the showing of the videotapes? That, you know, that is information that reasonable counsel may want to not have the jury hear  But, I mean, just as a general matter, you've got, I mean, as the State District and Federal District Court judges put it, these are double-edged evidence. Yes, they may provide additional fodder for cross-examination. They may also be incredibly damaging. And when it comes to whether or not to present those things, there is no per se rule. And that's what trial counsel's judgment, I mean, that is the quintessential exercise of trial counsel's judgment. So getting back to the standard of review, the question is not whether this court would disagree if reviewing it in the first instance. It's whether it is so unreasonable that people could not disagree about the validity of the trial court's decision. And even if it's debatable, you know, the decision of whether to stipulate and thereby avoid the admission of the evidence or allow it to be played for additional cross-examination purposes is not, that is something about which I would imagine if we took a survey of defense counsels, many would disagree. Now, as far as defense counsel's viewing of the CAC tape, the defendant in his testimony references himself viewing the CAC tape several times. And under Louisiana law, it's Louisiana Revised Statutes, Title 15, Section 440.1 et sec. I think it's going to be 440.5 paragraph C that talks about it can be given to the defendant if he's representing himself. Otherwise, counsel has to be present when he's viewing the tapes. And the state court record, pages 809 and 815, she said that in the tape, but those sorts of things. So I think the court can fairly infer that counsel was familiar with the contents of the tape. I see I've got a little more than eight minutes. I know I'm not required to use all my time unless the court has further questions. I have one procedural question, and maybe I could ask my colleagues, but I'll ask you. You said you were an assistant district attorney. And I think in Texas and Mississippi, the attorney general's office takes many of these cases. But in Louisiana, is it the individual district attorneys in the districts that handle their cases all the way up to the federal courts? Yes, sir. So under our state constitution, the attorney general has no authority over criminal cases unless the DA is recused, the DA requests assistance, or the AG goes into district court saying the DA isn't adequately representing the interests of the State. So the district attorney handles appeals, post-conviction, federal habeas, clemency hearings, the whole nine yards. So in your office, you handle all the cases that come out of Angola? No, not Angola. Oh. It's just where within the heat. So he is sentenced to do this. Where he was convicted? Right. So everybody convicted out of St. Tammany Parish, this is a St. Tammany case. And there's another parish called Washington that's rural and less populated. But yes. Mr. Larvardane, representative, in my recollection, Mr. Larvardane is deceased. If it's Edward Larvardane of Alexandria, that representative is deceased. My question is, was Mr. Larvardane's, a lot of times we get these 2255s, where there are either affidavits by the council or otherwise. Does the record show anywhere in the state proceedings, because I'm assuming this started a long time ago, was Mr. Larvardane's statement or affidavit anywhere in any of that, you know, way back when? You know, about this matter? I regret to say I do not know the answer to that question. Okay. Okay. Well, it wasn't mentioned in reference, which I assume means it wasn't, but I just thought I'd ask, given that there was a state court proceeding when this all germinated, which occurred some time ago. Okay. Thank you. Thank you. All right. We're back to you, Mr. Harrell. Good morning again. Just to follow up, Your Honor, where you had ended with opposing counsel for the state with regards to Mr. Larvardane, I am sorry to hear that he passed away. But prior to his passing, I did have the opportunity to speak to him regarding this case, and he did submit an affidavit, which was made part of the state court proceedings. That affidavit did not address, regrettably, this particular issue here. However, counsel did address his overall performance and indicated in his sworn affidavit that he felt he had grave doubts about the competency of his performance in this case. I understand he was not well versed in criminal matters, and he was doing the best that he could. But I think that leads to the larger point that I want to make with my last few minutes, which is simply because counsel has what he or she calls a strategy does not make that a strategy for purposes of constitutional law. Not everything gets paraded under the umbrella of strategy, and simply because we can label it as such doesn't make it a fact. And I want to direct the court's attention to this court's ruling in Beltran v. Cockrell, which is cited in the materials. In Beltran, we have a state court conviction out of Texas. We have a defendant who was convicted of armed robbery and murder. Collateral proceedings resulted in no relief at the state level. His ineffective assistance at counsel claim was denied or recommended to be denied by the magistrate. That recommendation was adopted by the district court. It comes before this court. This court reversed. Why? Because counsel at trial had a strategy. He had a strategy not to impeach a witness who identified his client, Mr. Beltran, as the culprit. Unfortunately, that witness had also identified another individual, at least tentatively, prior to trial during the investigation stages. Counsel was well aware of that identification, but he didn't want the jury to be aware of it. He felt the identification created an association between Mr. Beltran and this other suspect, an association that he thought could be inculpatory or incriminating. So he avoided at all costs the fact that the witness had identified somebody else as the suspect in the murder and in the robbery. And in doing so, this court held it was unreasonable. It was not merely a disagreement with his strategy. It was an unreasonable strategy. It was not, as the law requires, based on a thorough review of the facts and the law of the particular case. And, therefore, it was not to be condoned, and it was not to be held up under the Sixth Amendment standards of effective assistance to counsel. I submit that that is what's happened here. We can talk about academic discussions that occur in any other case that involves children and CAC interviews. But in this case, we had a confession that the child fabricated an incident of abuse. And I think the question before the court in deliberating on this matter and in considering this matter is how many things could this child have fabricated? How many things in a CAC interview could a child say, I made that up, I made that up, I was seriously just upset about being sent to my room? Before there becomes an onus on defense counsel, however many reservations he might have or she might have about that CAC tape, that they admit it into evidence that they impeached that witness because that's the situation we have here. Counsel knew she was perjuring herself. She was giving a false, demonstrably false statement in a tribunal under oath. Counsel had the resources to expose that. Counsel chose not to do it. Maybe counsel called this a strategy. Maybe he thought his strategy was nothing should ever come out from that CAC tape. But that does not mean it was a sound strategy based on the facts and the law of this case, and that's what this Court must consider. Under a Supreme Court case, Harrington v. Richter, isn't the question not what the individual lawyer's strategy was, but would it have been a sound trial strategy from any attorney? That's correct, Your Honor. That's correct. And I believe that standard dovetails perfectly with the facts of this case. Would it have been sound for any attorney in this situation, in these circumstances, to allow a witness to perjure themselves on the stand, sitting on a bombshell that could have revealed that perjury, in a case built upon the theory that these children were manufacturing incidents of abuse? And no, I do not believe any reasonable jurist, any reasonable attorney could have condoned such a strategy. What about the testimony of the other sister? I believe, Your Honor, that the impugning the testimony of the older sister impugns the testimony of the younger sister. These were not two distant victims. They were not children or parishioners at a church picnic. These were sisters within a year, 18 months, I believe, in age apart. There was nothing to impeach the younger sister? There were contradictions, Your Honor. There were contradictions in both CAC interviews, but nothing of the explosive nature of the older accuser's testimony. No, sir. But the defense theory had always been these young women had an opportunity, they had a motivation to collude, to conspire, to invent. And the younger child did make comments during her testimony that she would have considered lying if asked to by her older sister. I'm out of time, Your Honor. Thank you very much. All right. Thank you, both counsel and case. We will fully consider the evidence that's been presented, and we'll decide it.